Slip Op. 16-91

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| IMPERIAL SUGAR COMPANY, | |
| Plaintiff, | |
| v. | |
| UNITED STATES, | |
| Defendant, | Before: Mark A. Barnett, Judge |
| and | Court No. 15-00118 |
| CÁMARA NACIONAL DE LAS INDUSTRIAS AZUCARERA Y ALCOHOLERA, GOVERNMENT OF MEXICO, and AMERICAN SUGAR COALITION, | **PUBLIC VERSION** |
| Defendant-Intervenors. | |

<u>OPINION</u>

[The Court denies Plaintiff's Motion for Judgment on the Agency Record.]

Dated: October 5, 2016

*Gregory J. Spak,* White & Case, LLP, of Washington, DC, argued for plaintiff.  With him on the brief were *Kristina Zissis* and *Ron Kendler.*

*Karl S. von Schriltz,* Attorney, Office of the General Counsel, U.S. International Trade Commission, of Washington, DC, argued for defendant.  With him on the brief were *Dominic L. Bianchi*, General Counsel, and *Andrea C. Casson*, Assistant General Counsel for Litigation.

*Philippe M. Bruno,* Greenberg Traurig, LLP, of Washington, DC, argued for defendant-intervenor Cámara Nacional de las Industrias Azucarera y Alcoholera.  With him on the brief were *Rosa S. Jeong* and *Irwin P. Altschuler.*

*James R. Cannon, Jr.,* Cassidy Levy Kent (USA) LLP, of Washington, DC, appeared for defendant-intervenor American Sugar Coalition.  With him on the brief were *Robert C. Cassidy, Jr., Charles S. Levy,* and *Jonathan M. Zielinski.*

*Stephan E. Becker*, Pillsbury Winthrop Shaw Pittman LLP, of Washington, DC, appeared for defendant-intervenor Government of Mexico.  With him on the brief was *Sanjay J. Mullick.*

Barnett, Judge:  Plaintiff Imperial Sugar Company ("Imperial" or "Plaintiff") moves, pursuant to United States Court of International Trade ("USCIT") Rule 56.2, for judgment on the agency record, challenging the United States International Trade Commission's ("ITC" or "Commission" or "Defendant") determination that the agreements suspending the antidumping and countervailing duty investigations concerning sugar from Mexico eliminate completely the injurious effect of subject imports.  *See Sugar from Mexico*, 80 Fed. Reg. 16,426 (ITC Mar. 27, 2015) (determinations) ("Notice of Review Determinations"), Public Joint Appendix ("Public J.A.") Tab 1, ECF No. 62-1 (Tabs 1-10); Administrative Record ("A.R.") 1-139,[1] ECF No. 31; and accompanying Views ("Review Views"), A.R. 2-250, ECF No. 30; *see also* Confidential Joint Appendix[2] ("Conf. J.A.") Tab 16, ECF No. 61-2 (Tabs 11-21).  For the reasons discussed below, the Court denies Plaintiff's motion for judgment on the agency record.

---

[1] The Administrative Record is divided into three sections: the public portion of the record is indicated by a "1-" before the document number; the confidential portion is indicated by a "2-" before the document number; and the privileged portion is indicated by a "3-" before the document number.  *See* A.R. at 1.

[2] The Court references the confidential versions of the relevant views, staff reports, and briefs, if applicable, throughout this opinion.  However, the opinion does not contain confidential information.

BACKGROUND

## I.      The Underlying Investigations

On March 28, 2014, the American Sugar Coalition ("ASC") and its members[3] filed

antidumping ("AD") and countervailing duty ("CVD") petitions on sugar from Mexico.

*Sugar from Mexico*, 79 Fed. Reg. 18,697 (ITC Apr. 3, 2014) (institution of antidumping

and countervailing duty investigations and scheduling of preliminary phase

investigations).  On May 12, 2014, the ITC preliminarily determined that there was a

reasonable indication that the domestic sugar industry was materially injured by reason

of imports of sugar from Mexico.  *Sugar from Mexico*, 79 Fed. Reg. 28,550 (ITC May 16,

2014) (preliminary); *Sugar from Mexico*, USITC Pub. 4467, Inv. Nos. 701-TA-513 and

731-TA-1249 (May 2014) (preliminary), Public J.A. Tab 3, ECF No. 62-1 (Tabs 1-10);

A.R. 1-47, ECF No. 31; *see also Sugar from Mexico*, Inv. Nos. 701-TA-513 and 731-TA-

1249 (May 5, 2014) (preliminary), Confidential Final Consolidated Staff Report and

Views ("Prelim. Views") at 3, Conf. J.A. Tab 25, ECF No. 61-5 (Tabs 23-25); A.R. 2-10,

ECF No. 66.  In its preliminary determination, the Commission found that there is a

reasonable indication that the domestic industry was materially injured by reason of

subject imports of sugar from Mexico due to: (1) a significant volume and increase in

volume of subject imports during the period of investigation[4] ("POI"); (2) significant

---

[3] The ASC members include "domestic processors, millers, and refiners of sugar cane and growers of sugar cane and sugar beets."  AD Initiation, 79 Fed. Reg. at 22,795-60.
[4] The POI "encompasses crop year ("CY") 2010/11, CY2011/12, CY2012/13, and October-December of CY2012/13 and CY2013/14."  Prelim. Views at 5.  The U.S. crop year for sugar begins October 1st and ends on September 30th of the following year. *Id*. at 5 n.8.

underselling by subject imports which, coupled with the significant increase in subject

import volume, led to depressed domestic prices to a significant degree during the POI;

and (3) a significant adverse impact of the subject imports during the POI.  *See* Prelim.

Views at 47-58.

　　　The product scope of the investigations consisted of "sugar derived from

sugarcane and sugar beets from Mexico, which is chemically classified as sucrose, a

naturally occurring carbohydrate."  *Id.* at 8; *see also Sugar from Mexico*, 79 Fed. Reg.

22,795, 22,800 (Dep't Commerce Apr. 24, 2014) (initiation of antidumping duty

investigation) ("AD Initiation"); *Sugar from Mexico,* 79 Fed. Reg. 22,790, 22,793 (Dep't

Commerce Apr. 24, 2014) (initiation of countervailing duty investigation).  The scope of

subject imports included

> "raw" sugar (sugar with a sucrose content by weight in a dry state that
> corresponds to a polarimeter reading of less than 99.5 degrees), and
> "estandar," or standard sugar, which is sometimes referred to as "high
> polarity" or "semi refined" sugar (sugar with a sucrose content by weight in
> a dry state that corresponds to a polarimeter reading of 99.2 to 99.6
> degrees) . . . .  Also included in the scope of the investigations [were]
> "refined" sugar with a sucrose content by weight in a dry state that
> corresponds to a polarimeter reading of at least 99.9 degrees; brown
> sugar; liquid sugar (sugar dissolved in water); organic raw sugar; and
> organic refined sugar.[5]

Prelim. Views at 8-9.

　　　During the ITC's preliminary investigation, Imperial submitted responses to the

ITC's questionnaires but, otherwise, did not submit written arguments.  Def.-Intervenor

---

[5] "Estandar can be used either as a raw material input in the production of refined sugar
or as an input in the production of certain food and beverage products."  *Id.* at 9.

Cámara Nacional de las Industrias Azucarera y Alcololera's Resp. in Opp'n to Pls.' Mot.

for J. on the Agency R. ("Cámara Resp.") at 7, ECF No. 46.  Imperial also did not

participate in the investigative staff conference or file postconference briefs.

Confidential Def. United States Int'l Trade Comm'n's Opp'n to Pls.' Mot. for J. on the

Agency R. ("Def.'s Resp.") at 22, ECF No. 42.  Imperial entered its appearance in the

final phase of the Commission's investigation on December 9, 2014.  Cámara Resp. at

7.  Imperial did not participate in Commerce's AD and CVD investigations.  *Id.* at 8.

In its preliminary determinations, the Commission defined the domestic industry

"as the domestic producers as a whole of a domestic like product, or those producers

whose collective output of a domestic like product constitutes a major proportion of the

total domestic production of the product" pursuant to 19 U.S.C. § 1677(4)(A) (2012).[6]

Prelim. Views at 20 & n.87 (internal quotation marks omitted).  Accordingly, the ITC

based its domestic industry data on the questionnaire responses of "24 firms that

accounted for the vast majority of sugar production during October 2010 through

December 2013, including nine sugarcane millers, two firms that both mill and refine

sugarcane, four sugarcane refiners, seven sugar beet processors, and two firms that

primarily produce liquid sugar."  *Id*. at 4.

Plaintiff represents about seven percent of the domestic sugar industry, Oral

Argument ("Oral Arg.") at 7:29-7:50, and is referred to as a "destination refiner."

"Destination refiners" are "refiners that use imported raw sugar as an input."  Def.'s

---

[6] All references to the United States Code are to the 2012 edition, unless otherwise stated.

Resp. at 3.  Thus, "destination refiners" produce refined sugar and are members of the

domestic industry.  The input to their production process, notably, is raw sugar or

estandar and, when imported from Mexico, their imported input is subject merchandise

in the investigations.  *See id.*  The destination refiners segment of the domestic industry

constitutes about one-third of the domestic sugar industry.  Oral Arg. at 27:45-28:04.

On August 25, 2014, Commerce issued its affirmative preliminary determination

in the CVD investigation.  *Sugar from Mexico*, 79 Fed. Reg. 51,956 (Dep't Commerce

Sept. 2, 2014) (preliminary affirmative countervailing duty investigation and alignment of

final countervailing duty determination with final antidumping duty determination).  On

October 24, 2014, Commerce issued its affirmative preliminary determination in the AD

investigation.  *Sugar from Mexico*, 79 Fed. Reg. 65,189 (Dep't Commerce Nov. 3, 2014)

(preliminary determination of sales at less than fair value and postponement of final

determination).

On October 27, 2014, three days after its AD Preliminary Determination was

issued, Commerce announced that it had initialed draft AD and CVD suspension

agreements (collectively, "the Agreements") with the Government of Mexico ("GOM")

and Mexican exporters.[7]  Review Views at 4.  Commerce provided interested parties an

---

[7] "Initialing" the suspension agreements refers to Commerce's preliminary acceptance
of a proposed suspension agreement, 19 C.F.R. § 351.208(f)(2) (2014), and its
provision of said agreement(s) to petitioners and other interested parties to comment
on, prior to the possible acceptance of an agreement and suspension of the
investigation.  *See* 19 U.S.C. §§ 1671c(e), 1673c(e) and 19 C.F.R. § 351.208(f).  *Cf.*
Usinas Siderurgicas De Minas Gerais S/A v. United States, 26 C.I.T. 422, 424, 201 F.
Supp. 2d 1304, 1307 (2002) (Commerce and the Government of Brazil initialed a

Case 1:15-cv-00118-MAB   Document 77   Filed 10/12/16   Page 7 of 45

opportunity to comment on the draft suspension agreements.  *Id*.  On the day it initialed

the Agreements, Commerce "notified and consulted with" the petitioners and its

individual members, the ITC, and other interested parties pursuant to the notice and

comment requirements in sections 1671c(e) and 1673c(e).  *Sugar from Mexico*, 79 Fed.

Reg. 78,039 (Dep't Commerce Dec. 29, 2014) (suspension of antidumping

investigation) ("AD Suspension Notice"), Staff Report Inv. Nos. 704-TA-1 and 734-TA-1

(Review) ("Review Staff Report") Appendix A, A.R. 2-247, ECF No. 30; *Sugar from*

*Mexico*, 79 Fed. Reg. 78,044, 78,045 (Dep't Commerce Dec. 29, 2014) (suspension of

countervailing duty investigation) ("CVD Suspension Notice"), Review Staff Report

Appendix A, A.R. 2-247, ECF No. 30.  Commerce "invited interested parties to provide

written comments on the proposed suspension agreement[s]."  AD Suspension Notice,

79 Fed. Reg. at 78,039; CVD Suspension Notice, 79 Fed. Reg. at 78,045.  Numerous

interested parties, including Imperial, provided comments on the draft suspension

agreements.  AD Suspension Notice, 79 Fed. Reg. at 78,040; CVD Suspension Notice,

79 Fed. Reg. at 78,045; *see also* Rule 56.2 Mot. for J. on the Agency R. on Behalf of Pl.

Imperial Sugar Co., ECF No. 39, and Confidential Mem. of P. & A. in Supp. of Pl.'s Rule

56.2 Mot. for J. upon the Agency R. ("Pl.'s Mot.") at 4, ECF No. 39-1.

        In its comments on the proposed suspension agreements, Imperial stated that

the "draft suspension agreements—in their current form—are not in the public interest

and will result in fundamental disruptions of the U.S. sugar market."  Pl.'s Mot. at 4

_____

proposed suspension agreement before soliciting comments from interested parties

and, subsequently, signing the suspension agreement).

(internal citation omitted).  On December 19, 2014, after the notice and comment period

concluded, the Agreements were finalized.  AD Suspension Notice, 79 Fed. Reg. at

78,040; CVD Suspension Notice, 79 Fed. Reg. at 78,045.  Based on the comments

received, Commerce negotiated several changes from the draft agreements into the

finalized Agreements, including "revision[s] [to] the definitions of 'refined sugar' and

'other sugar,'" a decrease in the share of total exports that could consist of refined

sugar, "and adjustments to the reference prices, including increasing the absolute prices

as well as the price differential between the refined and other sugar."  Review Views at

4.  The relevant details of the Agreements are described below.

      Also on December 19, 2014, Commerce suspended the antidumping and

countervailing duty investigations.  AD Suspension Notice, 79 Fed. Reg. at 78,039; CVD

Suspension Notice, 79 Fed. Reg. at 78,044.

## II.    The Suspension Agreements

      The Agreements were entered into pursuant to express statutory authority that

provides for suspension as an alternative means of resolving an AD or CVD

investigation.  Review Views at 13; *compare* 19 U.S.C. §§ 1671a, 1673a, *with* 19 U.S.C.

§§ 1671c, 1673c.  These particular suspension agreements, so-called "(c)

agreements,"[8] have a distinct legal standard, which is to "eliminate completely the

injurious effect" of subject imports, identified in the underlying AD/CVD proceeding.  19

---

[8] So-called because they are entered into pursuant to subsection (c) of 19 U.S.C
§§ 1671c and 1673c.  Other types of suspension agreements include agreements to
eliminate or offset subsidies, agreements to eliminate dumping, and non-market
economy agreements.  *See* 19 U.S.C §§ 1671c(b), 1673c(b), and 1673c(l), respectively.

U.S.C. §§ 1671c(c)(1), 1673c(c)(1).  Such agreements have various statutory conditions

that must be satisfied before Commerce may enter into the agreement.  The authority to

negotiate and enter into a suspension agreement lies exclusively with Commerce.

Before entering into an AD or CVD (c) agreement, Commerce must find that

extraordinary circumstances are present.  19 U.S.C. §§ 1673c(c)(1); 19 U.S.C.

§§ 1671c(c)(1). The statute defines "extraordinary circumstances" as existing when

"(i) suspension of an investigation will be more beneficial to the domestic industry than

continuation of investigation, and (ii) the investigation is complex."  19 U.S.C.

§ 1673c(c)(2)(A); 19 U.S.C. § 1671c(c)(4)(A).  The statutory definition of "complex"

differs between an AD[9] and CVD[10] investigation.

If Commerce finds that extraordinary circumstances are present, then it must

also ensure that the proposed agreement serves the public interest and permits

practicable, effective monitoring.  19 U.S.C. § 1673c(d)(1)-(2); 19 U.S.C.

§§ 1671c(d)(1).  In the underlying proceedings, Commerce found that the requisite

conditions for the AD Agreement were satisfied.  *See* Mem. to Paul Piquado from Lynn

Fischer Fox, "Agreement Suspending the Antidumping Duty Investigation on Sugar from

Mexico: U.S. Import Coverage, Existence of Extraordinary Circumstances, Public

---

[9] An AD investigation is "complex" when it involves: (i) a large number of transactions to
be investigated or adjustments to be considered; (ii) the issues raised are novel; or (iii)
the number of firms involved is large.  19 U.S.C. § 1673c(c)(2)(B).
[10] A CVD agreement is "complex" when it involves: (i) a large number of alleged
countervailable subsidy practices and the practices are complicated; (ii) the issues
raised are novel; or (iii) the number of exporters involved is large.  19 U.S.C.
§ 1671c(c)(4)(B).

Interest, and Effective Monitoring Assistance" at 2 (Dec. 19, 2014), Review Staff Report

Appendix D, A.R. 2-247, ECF No. 30.  Commerce also found that the requisite

conditions for the CVD Agreement were satisfied.  *See* Mem. to Paul Piquado from

Lynn Fischer Fox, "Agreement Suspending the Countervailing Duty Investigation on

Sugar from Mexico: Existence of Extraordinary Circumstances, Public Interest, and

Effective Monitoring Assistance" at 1 (Dec. 19, 2014), Review Staff Report Appendix D,

A.R. 2-247, ECF No. 30; *see also* Mem. to Paul Piquado from Lynn Fischer Fox, "The

Prevention of Price Suppression or Undercutting of Price Levels by the Agreements

Suspending the Antidumping Duty Investigation on Sugar from Mexico" at 11-13 (Feb.

6, 2015) ("Commerce Mem. Feb. 6th"), Review Staff Report Appendix D, A.R. 2-247,

ECF No. 30 (addressing the additional requirements for CVD agreements pursuant to

section 1671c(c)(2),(3)).

The product scope of each agreement is the same as the respective underlying

investigation.  *See supra* p. 4.

### A.    CVD Agreement

The basis for suspending the CVD investigation was an agreement between

Commerce and the GOM, whereby the GOM agreed "not to provide any new or

additional export or import substitution subsidies on the subject merchandise and […]

agreed to restrict the volume of direct or indirect exports to the United States of sugar

from all Mexican producers/exporters," pursuant to 19 U.S.C. § 1671c(c).  CVD

Suspension Notice, 79 Fed. Reg. at 78,044; *see also* Agreement Suspending the

Countervailing Duty Investigation on Sugar from Mexico ("CVD Agreement"), Review

Staff Report Appendix D, A.R. 2-247, ECF No. 30.

The CVD Agreement "provides for multiple volume limitations that will control

both the total amount of sugar imported from Mexico as well as the specific volume of

refined sugar imports from Mexico that will be allowed into the United States."  Review

Views at 4-5; *see also* CVD Agreement, sect. V. "Export Limits."  The CVD Agreement

"effectively integrates Mexico into the U.S. Sugar Program by limiting the volume of

sugar exports from Mexico in a given crop year to residual U.S. Needs, as calculated by

USDA [United States Department of Agriculture (administrator of the U.S. Sugar

Program[11])] based upon its monthly WASDE [World Agricultural Supply and Demand

Estimates Report]."[12]  Review Views at 39 (internal citations omitted).  Commerce is

tasked with establishing and adjusting "an annual limit on the volume of sugar exports

from Mexico equal to projected U.S. demand," taking into account "beginning stocks

and projected domestic production, TRQ imports [(tariff rate quota imports pursuant to

---

[11] Since October 1990, the USDA has administered the U.S. Sugar Program to align domestic sugar supply with domestic sugar demand.  Prelim. Views at 40 & n.173.  The USDA regulates the quantity of sugar supplied by domestic producers to the U.S. market by assigning marketing allotments to cane millers and beet processors on a firm-specific basis, with the overall allotment set at 85 percent of projected U.S. human consumption of sugar in a given crop year.  *Id.* at 38-39.

[12] WASDE is published by the USDA.  CVD Agreement, sect. II.T.  The residual U.S. Needs are calculated by using USDA data in a specified formula published monthly in WASDE.  Review Views at 10-11 n.34.  U.S. Needs is defined in the CVD Agreement using the following calculation:

(Total Use*1.135) – Beginning Stocks – Production – TRQ Imports – Other Program Imports – Other Imports

*Id.* at 39 & n.124; *see also* CVD Agreement, sect. II. "Definitions", ¶ R.

the U.S. Sugar Program)], other program imports (such as . . . Free Trade Agreements), and other imports (such as high-tier imports), leaving ending stocks equivalent to 13.5 percent of U.S. demand." *Id.* at 39.  As the Commission explained, "U.S. Needs is essentially the portion of the U.S. market that USDA determines will not be served by other sources, including domestic production and other imports, assuming a stocks-to-use ratio of 13.5 percent." *Id.* at 10.

The CVD Agreement provides for periodic adjustments to Mexico's sugar export limits to meet U.S. Needs.  Annual sugar exports from Mexico are limited to 70 percent of the U.S. Needs as of October 1st, with the ability to adjust it upward to 80 percent as of January 1st, and 100 percent as of April 1st, assuming that U.S. Needs remain essentially the same or increase over the course of a crop year.  *Id.* at 40.  Commerce's ability to periodically adjust the limit on sugar exports from Mexico under the CVD Agreement "ensures that the volume of exports from Mexico during a crop year cannot significantly exceed actual U.S. Needs during that crop year."  *Id.*

The CVD Agreement also incorporates an anti-surge mechanism for imports from Mexico at the beginning of an export limit period, by capping exports from Mexico at 30 percent of U.S. Needs during the October 1st to December 31st period calculated using the July WASDE and 55 percent during the October 1st to March 31st period calculated using the December WASDE.  *Id.* at 40-41.  In addition, the CVD Agreement sets a sub-limit for exports of refined sugar, limiting such exports to fifty-three percent of total exports from Mexico to the United States during any given export limit period.  CVD Agreement, sect. V.C.3.; *see also* Review Views at 41.  Conversely, at least forty-seven

percent of the export limit from Mexico is reserved for sugar with a polarity of less than 99.5 degrees.  Review Views at 41.

### B.    AD Agreement

The basis for suspending the AD investigation was an agreement between Commerce and "signatory producers/exporters accounting for substantially all imports of Sugar from Mexico," whereby the signatory producers/exporters agree to sell subject imports at not less than the agreed upon reference prices, pursuant to 19 U.S.C. § 1671c(c).  AD Suspension Notice, 79 Fed. Reg. at 78,039; *see also* Agreement Suspending the Antidumping Duty Investigation on Sugar from Mexico ("AD Agreement"), Review Staff Report Appendix D, A.R. 2-247, ECF No. 30.

The AD Agreement sets minimum reference prices above which sugar from Mexico must be sold in the United States.  Review Views at 8, 47; *see also* AD Agreement, sect. VI "Price Undertaking."  The AD Agreement sets separate reference prices for refined and raw sugar: the reference price for raw sugar is $0.2225 per pound and refined sugar is $0.26 per pound.  Review Views at 47.  Additionally, exporters are required to ensure that their U.S. prices are such that they eliminate at least 85 percent of that exporter's margin of dumping.  *Id.* at 26 n.80 (citing section 1673c(c)(1)), 47.

### C.    The Review of the Agreements

On December 19, 2014, Commerce suspended both the antidumping and countervailing duty investigations.  AD Suspension Notice, 79 Fed. Reg. at 78,039; CVD Suspension Notice, 79 Fed. Reg. at 78,044.

Subsequent to the announcement of the signed Agreements, on January 8, 2015, Plaintiff and one other destination refiner[13] filed petitions requesting that the ITC review the Agreements pursuant to 19 U.S.C. §§ 1671c(h) and 1673c(h).[14]  *Sugar from Mexico*, Inv. Nos. 704-TA-1 and 734-TA-1 (review), USITC Pub. 4523 (Apr. 2015) ("Review Determinations") at 4, A.R. 1-148, ECF No. 31.[15]  On January 21, 2015, the ITC instituted the underlying reviews.  *Sugar from Mexico*, 80 Fed. Reg. 3,977 (ITC Jan 26, 2014) (institution of reviews of agreements suspending antidumping duty and countervailing duty investigations) ("Reviews Institution").

Several interested parties opposed the petitions for review of the Agreements and actively participated in the reviews, taking the position that the Agreements would

---

[13] That other destination refiner was AmCane Sugar LLC ("AmCane").  AmCane was a consolidated plaintiff and plaintiff-intervenor in this case.  AmCane subsequently voluntarily dismissed its case and withdrew as a plaintiff-intervenor.  *See generally* Order (Apr. 4, 2016), ECF No. 55 (dismissing AmCane pursuant to its Rule 41 Stipulation of Voluntary Dismissal).

[14] This is the first time the Commission has been asked to review a suspension agreement pursuant to subsection (h).  Review Views at 5 n.11.

[15] In the underlying proceeding, Defendant-Intervenor Cámara challenged Imperial's eligibility to request a subsection (h) review, asserting that Imperial did not qualify

> as "an interested party . . . to the investigation" under sections 704(h) and 734(h) because "parties to the investigations" are limited to those parties that actively participate in the investigations pursuant to Commerce regulation 19 C.F.R. § 351.102(a)(36), and to those parties that Commerce is obligated to notify about the proposed suspension agreements pursuant to 19 U.S.C. §§ 1671c(e)(1) and 1673c(e)(1).

*Id.* at 6 n.13.  The Commission rejected Cámara's arguments, finding that the "Commission's regulations do not require any particular level of participation during a particular phase of the investigation for a party to be a 'party to the investigation.'"  *Id.* (citing 19 C.F.R. § 201.11(a)).  Further, the Commissions found Imperial's entry of appearance, despite its filing date, sufficient to qualify as "a party to the investigation."  *Id.*

eliminate completely the injurious effect of subject imports.  These parties included American Sugar Refining ("ASR"),[16] the Sugar Coalition (domestic processors, millers, and refiners of sugar cane and growers of sugar cane and sugar beet), Cámara (Mexican producers/exporters of subject merchandise), CSC Sugar, LLC ("CSC") (a domestic sugar refiner and importer of subject merchandise), Batory Foods (a domestic wholesaler of the domestic like product), and the GOM.  Review Views at 7.  The USDA also had submitted written comments on the Agreements.[17]  *Id*.

After the reviews began, Commerce issued a memorandum addressing the prevention of price suppression and undercutting of price levels by the AD Agreement. *Id*. at 7 & n.14 (citing Commerce Mem. Feb. 6th).  Commerce issued an additional memorandum addressing other statutory requirements for entering into the (c) agreements.  *See id*. at 7. n.15 (citing Mem. to Paul Piquado from John McInerney, "Satisfaction of the Statutory Requirement That the Agreements Suspending the Antidumping and Countervailing Duty Investigations of Imports of Sugar from Mexico Eliminate Completely the Injurious Effects of Those Imports" (Feb. 10, 2015), Public J.A. Tab 23, ECF No. 62-5 (Tabs 23-25); A.R. 1-83, ECF No. 31).

Upon review, the ITC determined that the Agreements suspending the AD and CVD investigations concerning sugar from Mexico eliminate completely the injurious effect of subject imports.  Notice of Review Determinations, 80 Fed. Reg. at 16,426; *see*

---

[16] ASR is the largest domestic destination refiner.  *See* Oral Arg. 43:36 – 43:41 ("[T]he Commission [did not] ignore the largest destination refiner, American Sugar Refining.")
[17] United States government agencies are provided an opportunity to comment on proposed suspension agreements pursuant to 19 C.F.R. § 351.208(f)(3).

*also* Review Views at 3.  In its review, the ITC found "that the quantitative restrictions and reference prices established [in] the Agreements will result in higher U.S. prices for both raw and refined sugar, thereby working in concert to eliminate adverse price effects for the industry as a whole even if some mixed underselling by subject imports may continue to occur."  Review Views at 47-48 n.147.

Before this Court is Plaintiff's challenge to the ITC's affirmative Review Determinations.

## STANDARD OF REVIEW

The court will uphold an agency determination that is supported by substantial evidence on the record and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).  The two-step framework provided in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-45 (1984), guides judicial review of the Commission's interpretation of the antidumping and countervailing duty statutes.  *See Nucor Corp. v. United States*, 414 F.3d 1331, 1336 (Fed. Cir. 2005).  First, the court must determine "'whether Congress has directly spoken to the precise question at issue.'"  *Heino v. Shinseki*, 683 F.3d 1372, 1377 (Fed. Cir. 2012) (quoting *Chevron*, 467 U.S. at 842).  If Congress's intent is clear, then "'that is the end of the matter.'"  *Id.* (quoting *Chevron*, 467 U.S. at 842-43).  However, "[i]f the statute is silent or ambiguous," then the court must determine "whether the agency's action is based on

a permissible construction of the statute." *Dominion Res., Inc. v. United States*, 681

F.3d 1313, 1317 (Fed. Cir. 2012) (citing *Chevron*, 467 U.S. at 842-43).

To determine whether an agency's statutory construction is permissible, a court

considers whether the construction is reasonable, consistent with statutory goals, and

reflects agency practice. *Apex Exps. v. United States*, 777 F.3d 1373, 1379 (Fed. Cir.

2015).  If the agency's interpretation is permissible, then the court must accord it

deference, even if the agency's construction is not the "reading the court would have

reached if the question initially had arisen in a judicial proceeding." *Koyo Seiko Co.,

Ltd. v. United States*, 66 F. 3d 1204, 1210 (Fed. Cir. 1995).

When reviewing a determination under the substantial evidence standard,

substantial evidence is 'such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'" *Huaiyin Foreign Trade Corp. (30) v. United States*,

322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S.

197, 229 (1938)).  It '"requires more than a mere scintilla," but "'less than the weight of

the evidence.'" *Nucor Corp. v. United States*, 34 CIT 71, 72, 675 F. Supp. 2d 1340,

1345 (2010) (quoting *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004)).

In determining whether substantial evidence supports the ITC's determination, the Court

must consider "the record as a whole, including evidence that supports as well as

evidence that 'fairly detracts from the substantiality of the evidence.'" *Nippon Steel*

*Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).

That a plaintiff can point to evidence that detracts from the agency's conclusion or that there is a possibility of drawing two inconsistent conclusions from the evidence does not preclude the agency's finding from being supported by substantial evidence. *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933, 936 (Fed. Cir. 1984) (citing *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 619-20 (1966); *Armstrong Bros. Tool Co. v. United States*, 626 F.2d 168, 170 n.3 (C.C.P.A. 1980)). The court may not "reweigh the evidence or . . . reconsider questions of fact anew." *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1377 (Fed. Cir. 2015) (quoting *Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB*, 975 F.2d 807, 815 (Fed. Cir. 1992)); *see also Usinor v. United States*, 28 CIT 1107, 1111, 342 F. Supp. 2d 1267, 1272 (2004) (citation omitted) (The court "may not reweigh the evidence or substitute its own judgment for that of the agency").

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(B)(v).

DISCUSSION

## I.      LEGAL FRAMEWORK FOR SUSPENSION AGREEMENTS

### A.      Statute

Four statutory provisions are particularly relevant to this case: the CVD suspension agreement provision found in 19 U.S.C. § 1671c(c), the AD suspension

agreement provision found in 19 U.S.C. § 1673c(c), and their respective review

provisions, found in 19 U.S.C. §§ 1671c(h) and 1673c(h).

For CVD suspension agreements, section 1671c(c) provides, in relevant part:

**(c) Agreements eliminating injurious effect**
   **(1) General rule**
        If the administering authority determines that extraordinary
circumstances are present in a case, it may suspend an investigation
upon the acceptance of an agreement from a government described in
subsection (b) of this section, or from exporters described in subsection
(b) of this section, if the agreement will eliminate completely the injurious
effect of exports to the United States of the subject merchandise.

   **(2) Certain additional requirements**
        Except in the case of an agreement by a foreign government to restrict
the volume of imports of the subject merchandise into the United States,
the administering authority may not accept an agreement under this
subsection unless--
             (A) the suppression or undercutting of price levels of domestic
             products by imports of that merchandise will be prevented, and
             (B) at least 85 percent of the net countervailable subsidy will be
offset.

   **(3) Quantitative restrictions agreements**
        The administering authority may accept an agreement with a foreign
government under this subsection to restrict the volume of imports of
subject merchandise into the United States, but it may not accept such an
agreement with exporters.[18]

For AD suspension agreements, section 1673c(c) provides, in relevant part:

**(c) Agreements eliminating injurious effect**
   **(1) General rule**
        If the administering authority determines that extraordinary
circumstances are present in a case, it may suspend an investigation
upon the acceptance of an agreement to revise prices from exporters of
the subject merchandise who account for substantially all of the imports of
that merchandise into the United States, if the agreement will eliminate

---

[18] The CVD suspension agreement is a quantitative restriction agreement between
Commerce and the GOM.  Review Views at 14.

completely the injurious effect of exports to the United States of that merchandise and if—

> (A)  the suppression or undercutting of price levels of domestic products by imports of that merchandise will be prevented, and
> (B)  for each entry of each exporter the amount by which the estimated normal value exceeds the export price (or the constructed export price) will not exceed 15 percent of the weighted average amount by which the estimated normal value exceeded the export price (or the constructed export price) for all less-than-fair-value entries of the exporter examined during the course of the investigation.

These first two provisions are particularly relevant because they are the statutory authority for the two agreements into which Commerce entered.  As previously noted, the Agreements are sometimes referred to as (c) agreements because that is the subsection pursuant to which Commerce entered into the Agreements.  In both cases, the statute requires that the agreement eliminate completely the injurious effect of exports of subject merchandise to the United States.  Although Commerce is the agency authorized to enter into the agreements, the ITC is tasked with making an injury determination regarding a domestic industry.[19]  That bifurcation of responsibilities is reconciled by the review provisions found in the suspension agreement provisions of the statute.

When Commerce enters into an AD or CVD suspension agreement pursuant to subsection (c) (an elimination of injury agreement), subsection (h) of the respective AD

---

[19] Commerce's decision to enter into a suspension agreement is subject to judicial review pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iv).  This case, however, is not brought pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iv) and is not a direct challenge to Commerce's authority to enter into the Agreements.  Instead, Plaintiff challenges the ITC's review of the Agreements.

and CVD provisions establishes a process by which a domestic interested party may

request a review of the agreement by the ITC to determine whether the agreement

eliminates completely the injurious effects of subject imports:

**(h) Review of suspension**
  **(1)  In general**
       Within 20 days after the suspension of an investigation under
  subsection (c) of this section, an interested party which is a party to the
  investigation and which is described in subparagraph (C), (D), (E), (F), or
  (G) of section 1677(9) of this title may, by petition filed with the
  Commission and with notice to the administering authority, ask for a
  review of the suspension.

  **(2)  Commission investigation**
       Upon receipt of a review petition under paragraph (1), the
  Commission shall, within 75 days after the date on which the petition is
  filed with it, determine whether the injurious effect of imports of the subject
  merchandise is eliminated completely by the agreement. If the
  Commission's determination under this subsection is negative, the
  investigation shall be resumed on the date of publication of notice of such
  determination as if the affirmative preliminary determination under section
  [1671b(b)/1673b(b)] of this title had been made on that date.
       [...]
19 U.S.C. §§ 1671c(h), 1673(h).

     Such a review was requested and conducted with regard to both the AD and

CVD Agreements here.  The Commission found that the Agreements did eliminate

completely the injurious effect of the subject imports.  It is this review determination

made by the Commission that Plaintiff now challenges pursuant to 19 U.S.C.

§ 1516a(a)(2)(B)(v).

     **B.     Regulations**

     The underlying proceeding constitutes the first time the ITC has reviewed a

suspension agreement pursuant to 19 U.S.C. §§ 1671c(h) or 1673c(h).  The only

regulation the Commission has promulgated with respect to such reviews is 19 C.F.R.

§ 207.41.  That regulation mirrors some of the statutory language and indicate the types

of parties that may request such a review and the time period for the Commission to

complete the review.  No party has suggested that the Commission's regulation is

relevant to the issues raised in this judicial proceeding.

## II.      Plaintiff's Challenges to the Review Determination

In challenging the ITC's review determination, Plaintiff raises three main

arguments: (1) that the ITC's statutory interpretation of "eliminate completely" was not in

accordance with law; (2) that the ITC's analysis of the indicia of injury was unsupported

by substantial evidence or otherwise not in accordance with law; and (3) that the ITC's

failure to provide parties an opportunity to comment on an economic model was not in

accordance with law.  The Court will address each of these arguments, in turn.

## A.      The ITC's Interpretation of "Eliminate Completely."

Plaintiff argues that the Commission did not properly interpret the phrase

"eliminate completely" because it made an affirmative review determination (that the

Agreements would eliminate completely the injurious effect of the subject imports)

notwithstanding Plaintiff's assertion that the Agreements permit injury to destination

refiners.  Pl.'s Mot. at 13, 21.  The Commission responds that Plaintiff does not dispute

its interpretation of "eliminate completely" itself, but rather, objects that the Commission

interpreted the phrase "eliminate completely" in the context of the "injurious effect" to the

domestic industry as a whole identified in the preliminary injury determination.  Def.'s

Resp. at 21-22, 26-27.

   In its review of the Agreements, the Commission was tasked with determining

"whether the injurious effect of imports of the subject merchandise is eliminated

completely by the agreement."  19 U.S.C. §§ 1671c(h)(2), 1673c(h)(2).  However, the

terms "eliminated completely" and "injurious effect" are not defined in the statute, and,

therefore, the Commission construed their meaning in the context of the statute as a

whole.  Review Views at 19-20.

   Because the term "eliminate completely" is not present in other provisions of the

trade remedies statute, the ITC consulted Webster's Third New International Dictionary,

Unabridged (1981) ("Webster's") to define the term's plain meaning.  *Id.* at 22 n.64; *see

also* Def.'s Resp. at 3, 20.  The ITC defined "eliminate" as "to cast out, remove, expel,

exclude, drop, oust, to cause the disappearance of, to get rid of."  Review Views at 22

n.64 (citing Webster's at 736).  It defined "completely" "so as to be complete, full, to a

complete degree, entirely."  *Id.* (citing Webster's at 465).  The ITC noted that "Congress'

modification of the verb 'eliminate' with the adverb 'completely' . . . was intended to

communicate the strictness of the standard."  *Id.* (citing S. Rep. No. 96-249 at 54, 71

(1979)).

   Plaintiff disputes that the ITC applied the plain meaning of "eliminate completely"

and urges that "a review of the Commission's decision confirms that it construed the

statute contrary to its plain meaning."  Pl.'s Mot. at 13, 20.  Imperial insists that the ITC's

analysis of the statutory standard should have been performed "for all segments" and if

the ITC had done so, it would have seen that the destination refining segment would still suffer injury; in other words, the injurious effect was not eliminated completely.  Pl.'s Reply at 3-4.  The ITC asserts that it considered the domestic industry as a whole and, in doing so, considered all sectors of the domestic industry.  Review Views at 23-24.[20] Additionally, because suspension agreements are negotiated after the Commission's preliminary determination and before its final determination, the ITC noted that the only injurious effect of subject imports established at the time of the review is the injurious effect identified by the Commission in its preliminary injury determination.  *Id.* at 20. The ITC, therefore, interpreted the "injurious effect" that was to be eliminated completely to be the injury identified in the preliminary determinations.  *Id*. at 20-21.[21]

The statute is silent as to whom the injurious effect applies.  *See* 19 U.S.C. §§ 1671c(c), 1673c(c) (providing for suspension agreements "if the agreement will eliminate completely the injurious effect of exports to the United States").  Accordingly, pursuant to *Chevron*, the Court must determine whether the ITC's interpretation of eliminate completely is permissible.  *See Dominion Res.*, 681 F.3d at 1317 (citing *Chevron*, 467 U.S. at 842-43) (when the statute is silent or ambiguous as to the question at issue, the court must turn to the second *Chevron* step).  Applying the *Chevron* standard, the Court finds that the ITC's interpretation of eliminate completely to

---

[20] The ITC "focus[ed] on the injurious effects of subject imports on the domestic industry defined in the preliminary determinations, which included 'all producers of sugar within the scope of the investigations.'"  Review Views at 22.
[21] In so doing, the ITC noted that it was concerned with the injurious effects identified in its own preliminary determinations, as opposed to those identified by Commerce.  *Id.* at 21.

apply to the injurious effect on the domestic industry as a whole comports with the trade remedies statutory scheme, which, among other things, defines "industry" as "the producers as a whole of a domestic like product . . . ."  *See* 19 U.S.C. § 1677(4)(A).

"It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."  *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp*., 529 U.S. 120, 133 (2000) (citation and internal quotation marks omitted).  Thus, "reading the statute as a whole," Review Views at 22, it is clear that the statutory standard for an affirmative preliminary determination is, in pertinent part, "whether there is a reasonable indication that <u>a domestic industry</u> is materially injured," Prelim. Views at 3 (emphasis added).  In the preliminary determinations, the domestic industry statistics were derived from data supplied by "24 firms that accounted for the vast majority of the sugar production during October 2010 through December 2013."  *Id.* at 4.  These firms included "sugarcane farmers, millers and refiners, and sugar beet growers and processors."  *Id.* at 3-4.  The ITC's application of the suspension standard to the entire domestic industry is harmonious with reading the statute as a whole.

Additionally, the ITC's decision to apply the suspension agreements standard to the industry as a whole is consistent with language found in other provisions of the same statute.  For example, sections 1671c(c)(4)(A)(i) and 1673c(c)(2)(A)(i) require Commerce to evaluate the relative benefits of CVD and AD agreements to the "domestic industry," and when analyzing public interest factors, Commerce must assess the relative impact of the agreement on the competitiveness of the "domestic industry

producing the like merchandise."  AD Agreement, sect. V; CVD Agreement, sect. IV.

The ITC's approach to harmonizing all sections of the statute, by applying its injurious

effect analysis to the domestic industry as a whole, is reasonable.  *See Food & Drug*

*Admin.*, 529 U.S. at 133 (statutes must be interpreted so as to "fit, if possible, all parts

into an harmonious whole") (citation and internal quotation marks omitted).

      The ITC's interpretation of subsections (h), as requiring it to review the

Agreements to determine whether the injurious effect of subject imports identified in its

preliminary determinations is eliminated completely is also reasonable, because

Commerce may not enter into a suspension agreement that eliminates completely the

injurious effect of subject imports until after the ITC has issued an affirmative

preliminary injury determination.  *See* 19 U.S.C. §§ 1671b(b)(1), 1673b(b)(1)(A)).  In the

instant case, the injury identified in the preliminary determinations is the only injury

finding in effect at the time that Commerce was authorized to negotiate the agreements.

Thus, the injury established in the preliminary determinations served as a benchmark

for Commerce to negotiate the (c) agreements.

      Plaintiff's contention that the Agreements themselves have an injurious effect

that the Commission should have examined is unavailing.  Subsection (h) of both the

CVD and AD suspension agreement provisions requires the Commission to determine

whether the "injurious effect <u>of</u> <u>imports</u> <u>of</u> <u>the</u> <u>subject</u> <u>merchandise</u>" is eliminated.

19 U.S.C. §§ 1671c(h), 1673c(h) (emphasis added).  Plaintiff's loss of its commercial

advantage of large volumes of low priced subject imports as a result of the Agreements

is neither a harm that the statute contemplates nor a harm shared by all of the

destination refining segment.  *See* Review Views at 26; Def.'s Resp. at 26.  In its injury

analysis, the ITC rejected as inappropriate Plaintiff's argument that the Agreements

"themselves will have an injurious effect . . . on destination refiners."  Review Views at

25.  The Commission reasonably found that there is no requirement that it examine

injurious effects caused by anything other than the subject imports.[22]

     The suspension statutes also do not contemplate injury to a particular segment of

an industry caused by losing "a competitive advantage with respect to their U.S.

competitors."  Government of Mexico's Resp. in Opp'n to Pls.' Rule 56.2 Mot. for J. on

the Agency R. at 8-9, ECF No. 41.  Because it would lose its competitive advantage,

Plaintiff had no interest to eliminate dumping of its imported input, raw sugar.  Plaintiff's

complaint about its individual injury is misplaced; the ITC reasonably determined to

review the injurious effect on the entire domestic industry and not merely on Plaintiff's

individual injury.  The Commission reasonably found that there is no requirement that it

examine injurious effects caused by anything other than the subject imports.

     The Court finally considers Plaintiff's legislative history argument.  Plaintiff

discusses Congressional intent underpinning the (c) agreements, focusing on alleged

---

[22] Notably, Plaintiff did not challenge the ITC's selection of the period of review for which it considered whether the agreements would eliminate completely the injurious effect of the subject imports.  The ITC used the same POI as its preliminary investigation, plus a more current period for which it had data, to analyze the "likely conditions when the volume and price of subject imports will be determined by the operation of the agreements."  *Id.* at 19.  Thus, the ITC used the POI data (CY2010/11 through CY2012/13) as well as "what is likely to occur prospectively through crop year 2014/15, which is the only prospective period for which [the Commission had] data."  *Id*.  Thus, the time period for the Review Determination is CY2010/11 to CY2012/13 and CY2014/15.

Congressional concern with the term "eliminated completely."  Pl.'s Mot. at 14-18.

Plaintiff repeatedly points to legislative history for its definition of "eliminate completely"

to mean "no discernible injurious effect."  *Id.* at 17 (citing S. Rep. No. 96-249, at 54, 71).

Plaintiff's narrow interest in a low cost input, which is a lost benefit under the

Agreements, is not shared by the industry as a whole, or even within the segment to

which Plaintiff belongs.  For the industry as a whole, there is no discernible injurious

effect caused by suspending the AD and CVD investigations pursuant to these

Agreements that would limit imports and impose minimum reference prices.  Therefore,

the Court finds that the ITC's approach to defining the statutory standard of "eliminate

completely the injurious effect" is not inconsistent with the legislative history.

Accordingly, the Court holds that the ITC's conclusion that the Agreements

satisfy the statutory standard of "eliminate completely the injurious effect" of subject

imports is a permissible statutory construction.

## B.     THE ITC'S CONSIDERATION OF RECORD EVIDENCE

The Court next turns to Plaintiff's arguments that certain aspects of the ITC's

determination are not based on substantial evidence on the record.  As discussed

above, the court will uphold an agency determination that is supported by substantial

evidence on the record.  *See* 19 U.S.C. § 1516a(b)(1)(B)(i).

### 1.     Volume

Plaintiff contends that the CVD Agreement will neither reduce the volume of

refined sugar nor sufficiently limit imports of raw sugar.  Pl.'s Mot. at 24-31.  According

to Plaintiff, the injury to destination refiners from subject imports started in CY2011/12,[23]

when there was "too much" Mexican sugar in the U.S. market, and in particular, "too

much direct consumption sugar at low prices in order to gain market share."  *Id*. at 25.

Imperial alleges that this "export of direct consumption sugar" from Mexico resulted in

"oversupply in the U.S. markets"[24] and defaults on sugar loans.  *Id*.  Plaintiff notes that

"imports into the direct consumption channel from Mexico include not only 'refined'

sugar, but also 'estandar.'"  *Id*. (citing Prelim. Views at 9 & n.24).

Plaintiff further contends that the AD Agreement will neither eliminate

underselling nor prevent the influx of a "significant amount of 'direct consumption' sugar

into the United States from Mexico."  *Id*. at 26 (citing Second Written Submission of

Imperial Sugar Co. at 12-14, Conf. J.A. Tab 9, ECF No. 61-1 (Tabs 1-10); A.R. 2-243,

ECF No. 30).  Plaintiff explains that "because the Agreements use polarity as the sole

metric for defining 'refined' versus 'other sugar,' the reference price for refined sugar

does not apply to all direct consumption sugar that is imported from Mexico."  *Id*.

Plaintiff speculates that estandar could be interchanged with refined sugar, and alleges

---

[23] In contrast, the ITC found that the "refining segment as a whole was profitable" in CY 2011 and started to "experience[] a decline in their operating income" in CY2012/13.  *Id*. at 33 n.105.  However, the start date of the injury to the destination refiners segment is not relevant because, in the preliminary determinations, the ITC analyzed injury to the domestic industry as a whole.  *Id*.

[24] Plaintiff argues that "[d]ue to the large volume of subject imports during the fiscal year 2011/12, sugar stocks in the United States increased by 601,269 short tons raw value ("strv"), raising the ending stocks-to-use ratio up to a level of 17.2 percent, which is well above the 13.5 percent that USDA established."  Pl.'s Mot. at 25 (citing First Written Submission of Imperial/AmCane, Ex. 8, Conf. J.A. Tab 7, ECF No. 61-1 (Tabs 1-10); A.R. 2-236, ECF No. 30).

that, as written, the Agreements permit 100 percent of raw and refined Mexican sugar

exports to be "sold to the direct consumption market without a single ton going to the

refiners." *Id*. at 26, 29.  Plaintiff argues that "record evidence demonstrate[s] that direct

consumption sugar can enter the United States below the refined sugar reference

price." *Id*. at 26.  Consequently, Plaintiff concludes, the Agreements allow the "injurious

effect of this volume" to continue. *Id*.

Defendant responds that the Agreements were designed to eliminate the

injurious effect of subject imports by restricting their volume and establishing reference

prices below which subject imports may not be sold.  Def.'s Resp. at 2 (citing Review

Views at 4-5).[25]  According to Defendant, the volume of subject imports would have

been drastically reduced had the Agreements been in place during the Commission's

period of review. *Id*. at 30-31.  Defendant and Defendant-Intervenors assert that the

ITC is not tasked to review Plaintiff's speculative injurious effect caused by the

Agreements themselves. *Id*. at 40-41; Cámara Resp. at 4.  Further, the ASC argues

that "potential future injury to individual members of the domestic industry caused by the

Agreements is not relevant to the Commission's determination that the Agreements

eliminated completely the injury to the industry as a whole on the record before the

Commission at the time of its review."  Def.-Intervenor American Sugar Coalition's

---

[25] Defendant in its brief internally cited to the public version of the Review Views.  This
opinion uses the confidential version of the Review Views and, therefore, reference to
Defendant's internal citations have been adjusted accordingly. *See supra* p. 1 note 2.

Resp. in Opp'n to Imperial Sugar Co.'s Rule 56.2 Mot. for J. on the Agency R. at 3, ECF No. 44.

The Commission had determined that much of the injurious effect from the substantial volume of subject imports during the POI was sustained by millers in competition with subject imports destined for further processing rather than by processors/refiners, such as Plaintiff, in competition with subject imports destined for consumption.  Review Views at 44.  Record evidence supports the Commission's finding that, had the Agreements been in place between CY2011/12 and CY2012/13, the 94.5 percent volume increase in imports from Mexico would have been prevented.[26] *See id.* at 37, 42.

The subsequent surge the following year was "only possible" because NAFTA exempted Mexican sugar producers and exporters from the U.S. Sugar Program, as of January 1, 2008, allowing Mexican sugar free access to the U.S. market.  *Id*. at 38. Substantial evidence on the record, in the form of the Agreements themselves, indicates that the Agreements will effectively limit the annual volume of sugar exports from Mexico in a given crop year to the residual U.S. Needs, and include additional provisions to prevent surges of imports throughout any given crop year.  The ITC reasonably found that these import limitations, calculated by USDA based upon its

---

[26] The ITC "found that subject import underselling, coupled with the significant increase in subject import volume, depressed domestic prices to a significant degree during the period of investigation."  Review Views at 28.

monthly WASDE, will effectively integrate Mexico into the U.S. Sugar Program and prevent similar surges in the future.  *See id*. at 39.

With regard to the breakdown of imports between refined sugar and raw sugar, Plaintiff's argument is speculative.  Plaintiff contends that estandar could be interchanged with refined sugar and, as a result of the Agreements, would have direct consumption marketability.  Pl.'s Mot. at 25, 26, 29.  The Commission found that the record did not support Plaintiff's speculative argument.  *See* Review Views at 41-42 n.132 (discussing importation of estandar and its general unsuitability for direct consumption).  Estandar may be substituted for refined sugar "in certain end use products for which [its] darker color . . . was not an issue."  *Id*. (citing *Sugar from Mexico*, USITC Pub. 4467 at 7 & n.24; Prelim. Views at 9 & n.24).  However, record evidence indicates that customers or companies generally would not use estandar for direct consumption "because it has a higher quantity of foreign material in it than would normally be accepted in the U.S. market"; thus, "the vast majority of [estandar] gets used, consumed as raw sugar."  *Id*. (citation omitted). [27]  The Court finds that the ITC's evidence-based response to Plaintiff's speculative arguments was reasonable.

Accordingly, the Court finds that the ITC's determination that the injurious effect of increasing subject import volume is completely eliminated by the Agreements is supported by substantial evidence on the record.

--------

[27] Cámara further explained at oral argument that "estandar, if it is above 99.5 [percent polarity] it is [going to] be sold at refined prices . . . and if it is below 99.5 [percent polarity] it comes as raw sugar and will most likely go to the raw sugar market to be further refined."  Oral Arg. 1:17:23-50.

### 2.    Prices

The ITC found that "the AD suspension agreement works in concert with the CVD suspension agreement to eliminate completely the adverse price effects of subject imports identified by the Commission in the preliminary determinations." Review Views at 45.

### a.    Underselling

Plaintiff contends that underselling will continue but does not provide an explanation or record support for this assertion.  *See* Pl.'s Mot. at 31-32.  In response to Plaintiff's concerns about underselling, the ITC explained that it found that underselling itself was not causing material injury to the domestic industry in its preliminary determinations.  Review Views at 47.  Rather, the ITC found that underselling was "a cause of price depression."  *Id*.  Plaintiff rejects the distinction and asserts that "adverse price effects are 'injurious' regardless of their particular variety, and the [ITC's] admission that underselling could continue demonstrates" that "the Review Determinations are not supported by substantial evidence."  Pl.'s Reply at 11-12.

Defendant responds that the CVD and AD Agreements, "working in concert, eliminate completely the adverse price effects of subject imports identified in the preliminary determinations."  Def.'s Resp. at 32; *see also* Review Views at 46-47. Specifically, the Commission found that the CVD Agreement "preclude[s] any increase in subject import volume sufficient to adversely affect sugar prices" and establishes "an annual limit on sugar exports from Mexico," combined with provisions that prevent

surges of exports in any given quarter.  Review Views at 46.  The ITC found that the

CVD Agreement thereby eliminates the primary incentive for Mexican producers and

exporters to undersell the domestic like product "because doing so would reduce their

revenues with no compensatory increase in sales volume or market penetration over

the levels dictated by the annual export limit and anti-surge mechanism under the

agreement." *Id*. (citing Commerce Mem. Feb. 6th at 12).

In addition to having no incentive to undersell due to the CVD Agreement's

export limits, the ITC found that the AD Agreement establishes minimum prices for

Mexican exporters which will "substantially reduce instances of underselling" by setting

minimum reference prices for Mexican exports of raw sugar at $0.2225 per pound and

refined sugar at $0.26 per pound.  *Id*. at 47.

The Court finds that record evidence supports the ITC's determination that the

Agreements will work in tandem to eliminate price depression and address

underselling.[28]  In making this determination, the Court also considers the record

information that detracts "from the substantiality of the evidence."  *Atl. Sugar, Ltd. v.*

*United States*, 744 F. 2d 1556, 1562 (Fed. Cir. 1984).  Although the ITC found

"significant subject import underselling" in the preliminary investigation, the record

---

[28]  Underselling occurs when imported goods are sold for less than like domestic products.  A significant amount of imported undersold goods can depress--*i.e.*, lower-- the price of like domestic products.  *See* Review Views at 45; *see also* Commerce Mem. Feb. 6th at 3 (citing section 1677(7)(C)(ii) (instructing the Commission, in the context of injury determinations, to consider instances of underselling by imported merchandise and whether "imports of such merchandise otherwise depress[] [domestic] prices to a significant degree")).

indicates that underselling was found to be a contributor to price depression, not an injurious effect itself.  Review Views at 45.  The ITC analyzed whether price depression was eliminated by the Agreements and determined that it was eliminated through the effects of the Agreements in tandem, despite the possibility of underselling under the Agreements.  Plaintiff's speculation about the possibility of underselling must be contrasted with the ITC's analysis of the terms of the Agreements, and the Court finds that substantial evidence supports the Commission's determination.

The Court is unaware of any legal basis for asserting that every instance of underselling is necessarily injurious, yet that is effectively the position advocated by Plaintiff.  The Commission has explained that the Agreements take a two-pronged approach, with the CVD Agreement eliminating the incentive to undersell and the AD Agreement minimizing the opportunity to undersell, *see id.* at 41, 45-46, 52, and it is not the Court's role to reweigh the evidence relied upon by the Commission.  *See Downhole Pipe & Equip.,* 776 F.3d at 1377.  Accordingly, the Court finds that the ITC's underselling determination is supported by substantial evidence on the record.

### b.    Cost of Goods Sold

Plaintiff contends that the high cost of goods sold ("COGS") to net sales ratios for refiners will continue under the Agreements because a higher reference price for raw sugar raises refiners' COGS without providing the refiners the opportunity to achieve a reasonable refining margin.  Pl.'s Mot. at 32-33.  Plaintiff also speculates that the

reference price set for Mexico will extend to "other sources of supply of raw sugar," effectively raising the cost of its input regardless of source.  *Id*. at 32.

Defendant explains that "processors/refiners experienced an increase in their COGS to net sales ratio over the interim period [(interim CY2013/14)] because their unit sales values declined faster than their unit COGS, and not because of any increase in their unit costs."  Def.'s Resp. at 38 (citing Review Views at 29; *Sugar from Mexico*, USITC Pub. 4467 at Table VI-3).  The Commission reasonably surmised that, because the Agreements would eliminate price depression, as discussed above, they would also eliminate completely the depressed sales values that caused the elevated COGS to net sales ratio in interim CY2013/14.  *Id*. at 38-39 (citing Review Views at 45-46).

Substantial evidence supports the Commission's conclusion.  As the Commission found, "the average refining margin during the suspension agreements period was more than double the lowest refining margin during the period examined in the preliminary phase investigations."  Review Views at 50.  In other words, the ITC identified empirical support for its finding that the Agreements would alleviate, rather than exacerbate, the high COGS to net sales ratio experienced by the Plaintiff towards the end of the POI.  Accordingly, the Court finds that substantial evidence supports the ITC's determination with regard to the COGS to net sales ratio.

### c.  Price Calculations

Plaintiff contends that the Commission relied on flawed price calculations to compare refined domestic and import prices.  Pl.'s Mot at 33-34; Pl.'s Reply at 13-15.

Plaintiff asserts that the ITC ignored record evidence that transportation costs for

Mexican refined sugar were inflated and that costs for domestic refined sugar were

understated.  Pl.'s Reply at 14.  Plaintiff urges that the Commission "erroneously

maintains that [another U.S. sugar producer's] comparison included appropriate

packaging costs [...]."  *Id*. at 15.

Defendant-Intervenor Cámara explains that when analyzing the price

comparisons, the ITC "properly exercised its discretion to assign no weight to the data

presented by Imperial which did not compare prices on the same basis."  Cámara

Resp. at 5.  The ITC found the other producer's delivered price comparisons to be

"credible" because "they include all relevant packaging and delivery costs and exclude

delivered prices from domestic refineries to distant markets they could not serve

economically."  Review Views at 48.  In contrast, the ITC found that Imperial's

delivered price comparisons "inappropriately compare the delivered price of domestic

refined sugar, including packaging costs and delivery to the U.S. end customer, to a

price for refined sugar imported from Mexico that excludes packaging costs and the

cost of delivery from U.S. distributors to their end customers."  *Id.* at 48 n.149.  The ITC

also considered record evidence indicating that Imperial's delivered prices included

customers "in distant markets that would be uneconomical to serve from its refinery in

Savannah, GA."  *Id*.

The ITC has discretion to determine how much weight to assign to particular

data, and the Court will not reweigh the evidence.  *See Downhole Pipe & Equip.,* 776

F.3d at 1377.  Correspondingly, when two sets of data are presented on the record, the

ITC has discretion to decide the relative reliability of each set and to assign weight to the data presented.  *See id*.  The ITC's decision that the other producer's data regarding delivered price calculations was more credible than Plaintiff's lies squarely within the realm of the ITC's discretion.  Accordingly, the Court finds that the ITC's decision to use the other producer's data in the price calculation analysis is supported by substantial evidence on the record.

### 3.    Impact Factors

Plaintiff contends that the ITC failed to consider the impact of subject imports and inadequately considered the effect of the Agreements on the U.S. Sugar Program.  Pl.'s Mot. at 37.  As support for its contention, Plaintiff refers to impact factors found in 19 U.S.C. § 1677(7)(B)-(C), particularly, the actual and potential decline in output and capacity utilization.[29]  *Id*. at 37-38.  Plaintiff further alleges that the ITC's determination

---

[29] The pertinent provisions of section 1677(7) provide:
(iii) Impact on affected domestic industry.  In examining the impact required to be considered under subparagraph (B)(i)(III), the Commission shall evaluate all relevant economic factors which have a bearing on the state of the industry in the United States, including, but not limited to—
(I) actual and potential decline in output, sales, market share, gross profits, operating profits, net profits, ability to service debt, productivity, return on investments, return on assets, and utilization of capacity,
(II) factors affecting domestic prices,
(III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment,
(IV) actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product, and
(V) in a proceeding under part II of this subtitle, the magnitude of the margin of dumping.

is contrary to the Congressional mandate to maintain and utilize the capacity of the

domestic sugar refining sector.  *Id.* at 38-39.

The ITC reasonably determined that it was not required to consider anew the

impact factors referenced by Plaintiff because they had been considered in its

preliminary investigation.  *See* Prelim. Views at 52-56; Def.'s Resp. at 39-40.  As

discussed above, the ITC reasonably interpreted subsections 1671c(h)(2) and

1673c(h)(2) as requiring it to review the Agreements to assess whether the injurious

effect of subject imports <u>identified in the preliminary investigation</u> is eliminated

completely.  *See supra* Section II.A.  Therefore, Plaintiff's argument regarding these

factors is inapposite.[30]  Plaintiff's insistence that "such factors are especially important

---

The Commission shall evaluate all relevant economic factors described
in this clause within the context of the business cycle and conditions of
competition that are distinctive to the affected industry.
19 U.S.C. § 1677(7)(C)(iii).

[30] Plaintiff's reliance on a statement made in a brief in a case pending before this court is also unavailing.  *See* Pl.'s Mot. at 38 (citing *Fla. Tomato Exch. v. United States*, Court No. 13-00148).  In that case, a domestic party is challenging Commerce's decision to enter into a suspension agreement, asserting that Commerce failed to make a legally sufficient determination that the agreement completely eliminated the injurious effect of subject imports.  *Fla. Tomato Exch.*, Court No. 13-00148, Compl., ECF No. 7.  Although Imperial cites to the government's brief in that case as indicating that plaintiff in that case could have obtained the desired relief (consideration of impact factors found in section 1677(7)(B)-(C)) by petitioning for a review of the agreement by the Commission, *see* Pl.'s Mot. at 38 (citing *Fla. Tomato Exch.*, Court No. 13-00148, Def.'s Mem. in Opp'n to Pl.'s Rule 56.2 Mot. for J. on the Agency R. at 31-32, ECF No. 42), the scope of any such review would have to be determined by the Commission itself and may properly be limited based on the nature of the injury finding in the Commission's preliminary injury determination.  Indeed, the plain language of section 1677(7) directs the Commission to consider relevant impact factors when it makes preliminary and final injury determinations pursuant to subsections 1671b(a), 1671d(b), 1673b(a), and 1673d(b)—not when it reviews suspension agreements pursuant to subsections 1671c(h) and 1673c(h).  *See* 19 U.S.C § 1677(7)(B).

when analyzing injurious effect of subject imports for the members of the U.S. industry

who petitioned the Commission for review of the specific agreements" is not supported

by the record.  Pl.'s Mot. at 37.  To the extent that Plaintiff suggests that the ITC must

be concerned with the efficacy of the U.S. Sugar Program, Plaintiff fails to explain why

placing a cap (calculated with reference to the demand, production, and import figures

used to administer that same Program) on otherwise unlimited Mexican imports is

inconsistent with the goals of the Sugar Program, or why that Program must be taken

into consideration by the Commission in a review to determine whether the Agreements

eliminate completely the injurious effect of subject imports.

### C.    ITC'S USE OF AN ECONOMIC MODEL

Plaintiff argues that it was not provided notice and an opportunity to comment on

the ITC's use of an economic model run by Commission staff.  Pl.'s Mot. at 39-43.  The

economic model, which was a comparative static model, "generally showed that

domestic prices and revenues would have been higher in CY2012/13 had the

agreements been in place."  Def.'s Resp. at 41; *see also* Economic Modeling Mem. EC-

NN-003 (Mar. 13, 2015) ("Econ Model Mem."), Conf. J.A. Tab 11, ECF No. 61-2 (Tabs

11-21); A.R. 2-249, ECF No. 30.  The memorandum describing the economic model

and its results was placed on the Commission's record on April 15, 2015, approximately

two months after the parties' last submission (February 25, 2015), and approximately

one month after the Commission's final vote (March 19, 2015).  Pl.'s Mot. at 42 (citation omitted).

Plaintiff contends that it was deprived of a statutory right to comment on the economic model.  *Id.* at 40-41; Pl.'s Reply at 16-20.  Plaintiff relies on 19 U.S.C. § 1677m(g), which requires that timely submitted information in a proceeding is subject to comment by other parties.  Additionally, the provision specifies that before making a final determination under certain statutory provisions, the Commission "shall provide the parties with a final opportunity to comment on the information."  19 U.S.C § 1677m(g).  Similarly, Plaintiff further contends that it has a "basic right to confront evidence."  Pl.'s Mot. at 40.  Alternatively, Plaintiff contends that it has a right to comment pursuant to the Administrative Procedures Act ("APA"), 5 U.S.C § 554(c), which provides for an opportunity to comment on "the submission and consideration of facts."  *Id.* at 40; Pl.'s Reply at 20.

The Commission counters that "no statute or regulation granted Plaintiff[ ] the right to comment on the economic model."  Def.'s Resp. at 45.  The ITC explained that three of the Commissioners (Chairman Broadbent, Vice Chairman Pinkert, Commissioner Kieff) found "further support" in the economic model, which examined the possible effects of the suspension agreements.  Review Views at 50.  These Commissioners found that the results of the model provided "further corroboration" for their finding that the injurious effect of subject imports would be eliminated completely by the suspension agreements.  *Id.* at 51.

In response to Plaintiff's statutory arguments regarding the economic model issue, the ITC asserts that section 19 U.S.C. § 1677m(g) does not extend to review determinations pursuant to sections 1671c(h) and 1673c(h) and, thus, the comment requirement in section 1677m(g) is inapposite.  Def.'s Resp. at 45.  Further, Cámara points out that the economic model referenced in the ITC's determination "is not information submitted to the Commission," negating the application of both 19 U.S.C. § 1677m(g) and the APA.  Cámara's Resp. at 39.

Plaintiff has no statutory right to comment on the economic model because it is not submitted information or facts.  Economic models and their results are not submitted facts, but rather are analytical tools which the Commission applies to the submitted facts and the results of that application.  Subsection 1677m(g) is inapposite because it enumerates the particular final determinations to which it applies and that enumeration does not include sections 1671c and 1673c.[31]  Like the first sentence of subsection 1677m(g), any right to comment pursuant to the APA applies to submissions of facts; it

---

[31] 19 U.S.C. § 1677m(g) provides:
> Information that is submitted on a timely basis to the administering authority or the Commission during the course of a proceeding under this subtitle shall be subject to comment by other parties to the proceeding within such reasonable time as the administering authority or the Commission shall provide. The administering authority and the Commission, before making a final determination under section 1671d, 1673d, 1675, or 1675b of this title shall cease collecting information and shall provide the parties with a final opportunity to comment on the information obtained by the administering authority or the Commission (as the case may be) upon which the parties have not previously had an opportunity to comment. Comments containing new factual information shall be disregarded.

does not extend to the Commission's economic model, an analytical tool, and its results.[32]  For these reasons, Plaintiff's reliance on 19 U.S.C. § 1677m(g) and the APA is misplaced.[33]

Plaintiff also suggests that the Commission was required to establish "some threshold degree of reliability" for its economic model pursuant to *USX Corp. v. United States*, 12 CIT 205, 214, 682 F. Supp. 60, 69 (1988).  Pl.'s Mot. at 34-36.  The ITC and Cámara counter that the *USX* reliability requirement does not apply because use of the model in this case was merely for "further corroboration," Def. Resp. at 42 & n.8, and not "so central to the conclusion," Cámara Resp. at 43.  The ITC further contends that case law does not require it "to explain its use, or lack thereof, of economic models." Def.'s Resp. at 43 n.8 (citing *USEC, Inc. v. United States*, 25 CIT 49, 67, 132 F. Supp. 2d 1, 16 (2001), aff'd 2002 WL 732139 (Fed. Cir. 2002)).

---

[32] The relevant provision of the APA, 5 U.S.C 554(c), provides:
The agency shall give all interested parties opportunity for—
(1) the submission and consideration of facts, arguments, offers of settlement, or proposals of adjustment when time, the nature of the proceeding, and the public interest permit; and
(2) to the extent that the parties are unable so to determine a controversy by consent, hearing and decision on notice and in accordance with sections 556 and 557 of this title.

[33] In the alternative, the ITC raises the affirmative defense of harmless error.  Def.'s Resp. at 8.  As noted above, the use of the economic model was not outcome determinative because only three Commissioners referenced the model and, even then, only for "further corroboration."  Review Views at 51.  Even if those three Commissioners' votes were disregarded, the other three Commissioners voted affirmative without relying on the model and the determination would have been affirmative.  *See* 19 U.S.C. § 1677(11).  Thus, had there been any error, it would have been harmless.

Plaintiff's reliance on *USX* is inapposite.  In *USX*, the issue was the reliability of the elasticities that were used in the economic model, not the model itself.  Those elasticities were more akin to facts or data that were fed into the economic model.  Such facts and data are subject to comment and, in this case, were subject to comment because they had been identified by the Commission in the preliminary investigations— and the Commission made clear its reliance on data from the preliminary phase of the investigations in its reviews of the suspension agreements.  *See* Review Views at 19-21; *see also* Econ Model Mem. at 1 (noting that Commission staff used data from the preliminary investigation to run the economic model).  Consequently, to the extent that Plaintiff wished to question the reliability of the elasticities used in the economic model, it had that opportunity.  *See supra* pp. 4-5 (discussing Imperial's limited participation in the Commission's preliminary investigation).

For the foregoing reasons, the Court denies Plaintiff's request for a remand in order to comment on the economic model applied by the Commission staff.

## Conclusion

For the foregoing reasons, the Court denies Plaintiff's motion for judgment on the agency record.  Judgment will enter accordingly.


/s/      Mark A. Barnett____
Mark A. Barnett, Judge

Dated:   October 5, 2016_____
         New York, New York